IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Connie McClintock,<br><br>　　　　Plaintiff,<br><br>v.<br><br>Michael J. Astrue,<br>Commissioner of Social Security,<br><br>　　　　Defendant. | )<br>)　NO. CV06-363-TUC-JMR (JM)<br>)<br>)　REPORT AND RECOMMENDATION<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Pursuant to 42 U.S.C. § 405(g), Plaintiff Connie McClintock seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her benefits. This Social Security Appeal has been referred to the United States Magistrate Judge pursuant to Local Rule – Civil 72.2(a)(10) of the Rules of Practice of this Court. Based on the pleadings of the parties and the record submitted to the Court, the Magistrate Judge recommends that the District Court, after its independent review, grant in part and deny in part Plaintiff's Motion for Summary Judgment [Doc. No. 16] and grant in part and deny in part Defendant's Cross-Motion for Summary Judgment [Doc. No. 19].

**I.  Procedural Background**

McClintock first applied for Supplemental Security Income ("SSI") in 1974. (Tr. 23). Applications filed in 1974 and 1975 were denied at the initial stage and McClintock sought no further review. (Tr. 23). McClintock then received Child's Insurance Benefits ("CIB") on behalf of her daughter until 1977 when her daughter was no longer eligible. (Tr. 23). McClintock subsequently applied for SSI in March 1986, alleging disability since 1980. (Tr.

22, 699). McClintock's applications were ultimately denied by an administrative law judge ("ALJ") in 1988. (Tr. 699).

McClintock filed her current applications in 1995. She filed for CIB on behalf of herself, alleging disability since the day she was born, November 18, 1958. (Tr. 4, 22, 179-81). She also filed a claim for SSI alleging disability since July 1992. (Tr. 704). Following a hearing (Tr. 658-81), McClintock's applications were denied by ALJ F.H. Ayer in December 1997. (Tr. 22, 70-82). The Appeals Council granted McClintock's request for review and another hearing was held in November 2001. (Tr. 137-39 & 682-95). Another unfavorable decision was issued by ALJ Frederick J. Graf on January 25, 2002. (Tr. 90-99). The Appeals Council vacated the decision, however, because the claim file had been lost and the Council was therefore unable to determine whether the ALJ's decision had been supported by substantial evidence. (Tr. 175-76 & 699-700).

A final hearing was held on May 3, 2004. (Tr. 696-715). McClintock was represented by counsel and testified on her own behalf. During the hearing she withdrew her application for CIB. (Tr. 700). Following the hearing, ALJ Graf once again issued a decision finding hat McClintock was not disabled. (Tr. 22-35). McClintock's request for review by the Appeals Council was denied and the decision became the final decision of the Commissioner. (Tr. 11-14).

McClintock subsequently filed her complaint in this case seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). In her motion for summary judgment, McClintock asserts that the ALJ failed to properly analyze her credibility, ignored evidence of her motivations to work and the impairments that prevented her from doing so, improperly drew a negative inference from her failure to comply with medical treatment, improperly evaluated her RFC, failed to call the required Vocational Expert, and improperly found her not disabled. *Plaintiff's Memorandum*, pp. 1-12. In terms of relief, McClintock seeks an order awarding benefits.

In the response and cross-motion, the Commissioner argues that the ALJ properly assessed McClintock's RFC and credibility, and properly relied on the Medical-Vocational

Guidelines. *Defendant's Brief*, pp. 1-8. Alternatively, the Commissioner requests that this matter be remanded for further consideration by the ALJ.

## II.     Record on Review

### A.     Relevant Examination and Treatment Records

McClintock was 45 years old at the time ALJ Frederick Graf issued his decision. (Tr. 35). She competed eighth grade and has never held a job long enough for it to qualify as substantial gainful activity or past relevant work. (Tr. 23, 35).

From 1992 through 1995, McClintock treated with R.L. Goedecke, D.O., for headaches, sleep problems and pre- and post-natal care. (Tr. 360-372). In May 1995, Dr. Goedecke completed a form for the Arizona Department of Economic Security ("DES") indicating that McClintock was unable to work for three months due to migraine headaches, congenital cataracts and a hiatal hernia. (Tr. 359).

On August 12, 1995, David Taylor, M.D., from the DES Disability Determination Service ("DDS"), issued a report after examining McClintock. (Tr. 373-376). Dr. Taylor concluded that despite McClintock's claims of migraine headaches, cataracts, hiatal hernia, tendonitis in the knee, obesity, fatigue, anxiety and sleep problems, she was "able to participate in work related activities almost fully." (Tr. 376).

On September 21, 1995, a Psychological Report was prepared by Francisco Sanchez, Ph.D., at the request of DDS. (Tr. 377-380). McClintock's presenting complaint was anxiety. (Tr. 377). Dr. Sanchez did not find any substantial psychological impairments and stated that:

> [McClintock's] functional capacities in terms of understanding, adjusting, relating, and following directions are adequate. Her ability to concentrate and attend to task is normal. Reasoning and decision making was adequate. She is capable of doing simple, non-skilled work.

(Tr. 380).

In June 1996, Ricci Silberman, P.A., reported that McClintock requested Silberman to complete disability forms because "Social Security wants her to have disability . . . ." (Tr. 392). Silberman noted that McClintock was "attempting to get disability for cataract

problem, severe migraines and [a] hiatal hernia." (Tr. 392). McClintock was referred to a neurologist and an ophthalmologist but Silberman indicated that she was "not comfortable with doing a disability form it is not something I normally deal with and her diagnoses are no reason for disability as a result of this." (Tr. 392).

In October 1996, Jamie Monroe, M.D., found that McClintock was presbyopic, but that her visual acuity was 20/30 bilaterally with correction, and that her visual field defects were "not consistent with any specific neurological deficit or ocular disease." (Tr. 407).

Also in October 1996, McClintock was seen by Jeanette Wendt, M.D., a neurologist, for her migraine headaches. (Tr. 405-406). The neurological findings were normal. Dr. Wendt noted that McClintock was "somewhat reluctant" to take the prescribed daily medication and noted that she also prescribed Tylenol 3 to take as needed. (Tr. 406).

In November 1996, McClintock's insomnia was evaluated by Ezequiel Esparza, M.D. (Tr. 412-414). Her insomnia was described as "debilitating," but did not meet the criteria for diagnoses of depression, psychotic disorder, mood disorders, or anxiety disorders. (Tr. 413). Dr. Esparza's plan was to refer McClintock to a sleep disorder clinic, but did not prescribe medication, noting that "[t]here seems to be some organic factors going on, specifically related to caffeine and nicotine." (Tr. 414).

Beginning in May 1997, Mary Ann Coady, M.D., from CODAC Behavioral Health Services, began seeing McClintock. Dr. Coady wrote a note to DES indicating that she was treating McClintock for insomnia and that she was "unable to work at this time" and should be "re-evaluated in six months." (Tr. 422). In December 1997, Dr. Coady again indicated that McClintock was "unable to work," but in January 1998 noted that she was being treated with a new medication and "may need 6 months for treatment before she is able to work." (Tr. 421). In July 1998, Dr. Coady noted that McClintock "reports she is unable to work at this time," and will be "re-evaluated in 6 months." (Tr. 419).

In May 2003, McClintock's corrected visual acuity was again reported as 20/30 in both eyes. (Tr. 436).

In June 2003, Stephen Cohen, M.D., McClintock's primary care physician, noted that:

> I told her that I cannot keep writing letters in support of disability for her, in the long run. I believe that her conditions will be cured, or at least relived enough to work, by surgery and treatment. She has not followed up with treatments as prescribed by Dr. Baron, does not wear her eyeglasses despite having complaint of poor vision that prevents her from working.

(Tr. 477 & 479).

In August 2003, McClintock saw Edward Schwager, M.D. (Tr. 476). Dr. Schwager reported that this was her first office visit with him and that she was transferring from Dr. Cohen because it was McClintock's impression that "Dr. Cohen is insisting that she proceed with surgery which she does not feel that she needs an [sic] order for him to continue her care and deal with disability paperwork, etc." (Tr. 476). Dr. Schwager found that, based on a limited examination, he did not find her to be "severely disabled at this time." (*Id.*). He also noted that McClintock "stated that vocational rehab would not work with her because her disabilities [were in] too many different areas of her body." (*Id.*).

In November 2003, ophthalmologist Kenneth S. Snow, D.O., in a letter to Dr. Schwager, stated that he had followed McClintock "for some time with congenital cataracts," and noted that, "[a]pparently she was seen by another ophthalmologist, who recommended cataract surgery." (Tr. 533). Dr. Snow then reported that:

> Certainly it may be possible that cataract surgery should be done in the future, but today her visual acuity is 20/30, does not drop in ambient light and really does not meet the criteria for cataract surgery. [McClintock] is also doing well visually and does not feel like she's had a significant loss in her vision.

(*Id.*). Based on these observations, Dr. Snow indicated that the best approach would be to observe McClintock and see her again in a year. (*Id.*).

**B.     University of Arizona Vocational Assessment**

In February, March and April of 2000, McClintock was referred to the Disability Assessment Research Clinic for the stated purpose of "determining her capacity to participate in a vocational rehabilitation program . . . ." (Tr. 587). She was seen by Anthony Bavry, M.D., who noted her history of musculoskeletel problems, migraines, insomnia, and hiatal hernia. (Tr. 585). He found that McClintock could lift 20 pounds occasionally and 10

pounds frequently, walk/stand for less than 6 hours a day, and could not sit for 6 hours a day. (Tr. 585). In describing her employment barriers, Dr. Bavry stated that:

> Overall this patient's motivation appears to be on getting on disability. She first applied for disability 10 years ago and was unsuccessful at this time, she reapplied in 1995 and has been trying to get on disability since that time. From a medical standpoint, there is little objective evidence of this patient being profoundly disabled. She would most certainly benefit from physical therapy, given her numerous and somewhat vague musculoskeletal complaints.

(Tr. 586).

As part of the vocational evaluation, McClintock was also seen by Charles Rastatter, Ed.D., in March 2000. (Tr. 587-96). Although Dr. Rastatter found that McClintock "has a number of excellent cognitive performance skills and abilities that would benefit her in a work situation," and that she would be "best served in a Sedentary or Light Work situation," he concluded that "because of her frequent episodes of migraine headaches, she will probably be absent from work on a regular basis," and due to this condition could have "significant problems in finding and maintaining regular employment in any competitive labor market job." (Tr. 595). His recommendations were to obtain additional information about her psychological and physical status so that her vocational outlook could be fully determined. (Tr. 595-96).

On April 4, 2000, David Smith, D.Ed., interviewed McClintock and competed a final report for McClintock's vocational rehabilitation evaluation. (Tr. 612-16). Dr. Smith noted that McClintock believes her most disabling condition is her visual problems, that she "brought numerous medical files which attested to her migraine headache history, visual problems and knee involvement," and stated that she weighs "in excess of 200 lbs." He stated that he saw "no unusual psychological characteristics." (Tr. 613). Dr. Smith indicated that McClintock's visual problems "appear to be somewhat debilitating as well as the physical limitations which would certainly need to be addressed were the client to attempt to work an eight hour day." (Tr. 614). He concluded that, "until her visual problems are resolved, she will be severely impaired," and that "until her eye problems are resolved, her

physical capacities, which are diminished, will prevent her from participating in any training program designed to prepare her for sedentary work. (Tr. 615). Dr. Smith recommended that McClintock be examined by an eye specialist to see if there was a relationship between her vision and her headaches, that her depression treatment be assessed, and that "she may be a candidate for SSDI while training for a sedentary position." (Tr. 616).

### C.   Lay Witness Statement

In April 2004, McClintock's sister, Carol Kubachi wrote a letter to McClintock's attorney. (Tr. 253-54). In the letter, Ms. Kubachi presented her recollection of McClintock's childhood and described her medical history. She stated that McClintock was bright but had trouble in school due to her cataracts. (Tr. 253). Her vision problems also caused headaches and, at age 9 or 10, started having migraine headaches. (*Id.*). She described more recent migraine episodes, her history of hiatal hernia, low grade dysplasia, a torn ligament in her right knee, two bulged disks in her lower back, and a minor tear in the rotator cuff of her left shoulder. (Tr. 253). Ms. Kubachi also revealed that she and McClintock cared for their mother who had recently suffered a stroke. (*Id.*). She stated that it took both of them to tend to their mother because she was "a heavy woman." (Tr. 254).

### D.   McClintock's Testimony

McClintock testified that she worked for a dry cleaner and as a housekeeper in the early 1990s, but that she had problems with those jobs due to her hernia and migraines. (Tr. 703-704). She stopped working altogether in July of 1992. (Tr. 704).

Her typical migraine pattern was one or two migraines per week; they would last an average of six hours. Sometimes, a couple of days. She described the migraines as causing intense pain and rendering her unable to talk or feel parts of her body. (Tr. 704). McClintock treated the migraines by going to a quiet dark place to wait it out. Even after the migraine has ceased, she would experience residual pain for two or three days and have trouble with her speech and word selection. (Tr. 705). Class 2 pain killers such as Oxycontin did help the pain, but did not do anything for the auras, vision, nausea, and numbness. (Tr. 706).

McClintock also testified that she had trouble with her vision. After about 20 or 30 minutes of reading, she would get a tension headache from eye strain. (Tr. 706). McClintock also described having insomnia. (Tr. 706). She could sleep about 90 minutes at a time, and sometimes goes 20 hours without any sleep. (Tr. 707). She was treated with multiple medications that did not resolve her problems. (Tr. 707-708).

Additionally, McClintock testified that she has a torn rotator cuff that is non-surgical, but causes her sharp pain. (Tr. 708). She also stated that she has a hiatal hernia and Barrett's esophagitis. She treats the esophagitis with Prilosec, but that leaves her nauseous. (Tr. 709). She has problems with her left hip that are related to bulging discs and arthritis in he lumbar spine. This condition renders her unable to bend, sit for very long, or walk more than 5 or 10 minutes. (Tr. 710).

### III.  ALJ's Decision

In the decision dated January 27, 2005, that ALJ found that McClintock had no history of past relevant work and had never engaged in substantial gainful activity. (Tr. 23, 34). He conlcuded that McClintock suffered from the following severe impairments: congenital cataracts; hiatal hernia; GERD; insomnia; obesity; and migraine headaches. (Tr. 23, 34). None of the listed impairments were found to meet or equal any of the impairments listed in 20 C.F.R. 404, subpart P, Appendix 1, and the ALJ proceeded to evaluate whether McClintock had the RFC to adjust to other work. (*Id.*) He concluded that she had the RFC to frequently lift/carry ten pounds and occasionally lift/carry 20 pounds, sit for about six hours and stand/walk for about six hours in an eight hour work day, and that McClintock's visual deterioration prevented her from working around unprotected heights or dangerous equipment. (Tr. 34-35). The ALJ found that she had no past relevant work. (Tr. 23, 35). Relying on the Medical-Vocational Guidelines, 20 C.F.R. part 404, subpt. P, App. 2, the ALJ determined that McClintock was not disabled because she could perform a significant number of jobs existing in the national economy and therefore was not disabled under the Social Security Act.. (Tr. 35-35).

**IV.     Discussion**

Whether a claimant is disabled is determined using a five-step sequential evaluation process. To establish disability, the claimant must show (1) she is not engaged in SGA, (2) she has a severe physical or mental impairment, and (3) the impairment meets or equals a listed impairment, or (4) her residual functional capacity precludes her from performing her past work. At step five, the ALJ must show that the claimant has the residual functional capacity to perform other work that exists in substantial numbers in the national economy. 20 C.F.R. § 416.920(a)(4)(i) - (iv). While the claimant has the burden of proof at steps one through four, "the ALJ has an affirmative duty to assist the claimant in developing the record at every step of the inquiry." *Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).

**A.     Credibility Assessment**

Determinations of a claimant's credibility are to be made by the Commissioner through the ALJ. *Talifson v. Secretary of HHS*, 554 F.Supp. 575, 580 (D.Mont. 1982). A reviewing court must give "great deference to credibility determinations made by administrative law judges." *Silver v. United States Postal Service*, 951 F.2d 1033, 1042 (9th Cir.1991). A finding that a claimant is less than credible must have some support in the record. *Talifson*, 554 F.Supp. at 580. However, these findings must be sufficiently specific to allow a reviewing court to conclude that the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony. *Bunnell v. Sullivan*, 947 F.2d 341, 345-56 (9th Cir. 1991) (citation omitted).

McClintock asserts that the ALJ misconstrued statements from her sister, Connie, and improperly relied on them to support an adverse credibility finding. Specifically, Connie provided a statement that indicated both she and McClintock were caring for their mother, but McClintock contends that the ALJ incorrectly construed the letter as indicating that McClintock was caring for her mother alone. *Plaintiff's Memorandum*, pp. 3-4. Looking to the decision, the only reference to the letter appears at page 9. (Tr. 30). There, the ALJ states that Connie "has been out of work for three months and they both [she and McClintock] must be there to physically care for their mother." (*Id.*). Based on that

statement, it appears the ALJ interpreted the letter just as McClintock contends he should have.

Next, McClintock asserts that the ALJ failed to properly analyze her credibility because he ignored evidence from the University of Arizona's Disability Assessment that demonstrates her motivation but recognizes the impairments that limit her ability to work. *Plaintiff's Memorandum*, pp. 5-6. McClintock notes that the Disability Assessment concluded that she could not be competitively employed until her eye problems were resolved. However, the ALJ's decision to reject this opinion is supported by other evidence in the record. As the Commissioner points out, Dr. Bavry, the only physician who evaluated her at the University of Arizona, reported no visual limitations in summarizing her medical condition. (Tr. 585). More important, however, the specialists who examined her found that her vision was not disabling, but was actually 20/30 bilaterally with correction. (Tr. 407, 536, 581). Despite this evidence, McClintock complains that the ALJ failed to note "How those opthalmological findings would indicate that McClintock was able to work." *Plaintiff's Memorandum*, p. 6. Although the ALJ does not expressly state his conclusion, the Court can think of no other than the fact that he concluded that McClintock's vision was not disabling. The record provides ample support for that conclusion.

### B.     McClintock's Non-Compliance

McClintock objects to the ALJ's reliance on her non-compliance with medical treatment as support for his decision to discount the alleged intensity and duration of her pain complaints. (Tr. 31). Social Security Ruling 96-7 outlines the criteria for evaluating a claimant's credibility and provides that claims of pain may be deemed less credible where the "frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." *Id.* The Ruling further provides that:

> the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent

or irregular medical visits or failure to seek medical treatment.

*Id.*

Here, the ALJ did not seek an explanation from McClintock regarding why she declined certain treatments and did not comply with other treatment recommendations. In her memorandum, she explains that she did try to take medications for her headaches and that her doctors had not recommended surgery for her eyes. The ALJ's failure to explore these explanations was in violation of SSR 96-7p and merit the remand of this action on that point.

### C.   Residual Functional Capacity Assessment

The ALJ found that obesity, one of McClintock's impairments, was considered "severe" within the meaning of the Social Security Act. (Tr. 34). However, he did not consider that condition in combination with her other identified ailments. The Commissioner has issued a Ruling addressing the role of obesity in disability assessments.[1] Social Security Ruling 02-1p (2002), 2000 WL 628049, provides that obesity can be a severe impairment if, when considered alone or combined with other impairments, it causes more than a slight limitation on a individual's ability to perform basic work. *Id.* In assessing the severity of obesity, the Ruling provides that an "individualized assessment of the impact of obesity on an individual's functioning" is necessary, and that, if obesity is found to be a medially determinable impairment, "any functional limitations resulting from the obesity" must be considered in the RFC assessment. *Id.*

In his Decision, the ALJ recognized that obesity was one of the impairments alleged by McClintock that are considered to be "severe" under the Social Security Act. (Tr. 23). However, other than that mention, obesity was not considered in the Decision. It is the ALJ's responsibility to determine the effect of a claimant's obesity on her other impairments, as well as its effect on her overall health and ability to work. *See Celaya v. Halter*, 332 F.3d

---

1.   The Secretary issues Social Security Rulings to clarify the Secretary's regulations and policy." *Bunnell v. Sullivan*, 947 F.2d 341, 346 n. 3 (9th Cir. 1991). Although they do not have the force of law, the rulings represent the Secretary's interpretation of its regulations. *Id.* They are therefore given deference by courts unless they are inconsistent with the statute or regulations. *Id.*

1177, 1182 (9th Cir. 2003). By failing to discuss and consider McClintock's obesity in the disability analysis, the ALJ did not fulfill these requirements.

### D. ALJ's Reliance on the Medical-Vocational Guidelines

The Medical-Vocational Guidelines, commonly known as "the grids," are a matrix system for handling claims that involve substantially uniform level of impairment. *See* 20 C.F.R. pt. 404, subpt. P, app. 2. McClintock contends that the ALJ erred by relying on the grids, rather than obtaining testimony from a Vocational Expert, because she is suffering from a vision impairment that amounts to a significant non-exertional limitation. *See Tackett v. Apfel*, 180 F.3d 1094, 1101- 1102 (9th Cir. 1999) (noting that "significant non-exertional impairments, such as poor vision . . . may make reliance on the grids inappropriate.") However, as discussed above, the ALJ's determination that McClintock's functional abilities are not significantly limited by her vision was supported by the record. As such, the ALJ was not required to consult a VE in this regard. However, because the ALJ erred in not inquiring into McClintock's reasons for not following certain medical advice and not considering her obesity, the ALJ will need to reconsider her RFC on remand and may reconsider the necessity of consulting with a VE.

### V. Recommendation

The Magistrate Judge recommends that the District Court, after its independent review of the record, enter an Order **granting in part and denying in part** Plaintiff's Motion for Summary Judgment [Doc. No. 16], **granting in part and denying in part** Defendant's Cross-Motion for Summary Judgment [Doc. No. 19], and **remanding** this action for further consideration consistent with this Report and Recommendation.

This Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment.

However, the parties shall have ten (10) days from the date of service of a copy of this recommendation within which to file specific written objections with the District Court. *See* 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure.

Thereafter, the parties have ten (10) days within which to file a response to the objections. If any objections are filed, this action should be designated case number: **CV 06-363-TUC-JMR**. Failure to timely file objections to any factual or legal determination of the Magistrate Judge may be considered a waiver of a party's right to *de novo* consideration of the issues. *See United States v. Reyna-Tapia* 328 F.3d 1114, 1121 (9th Cir. 2003) (*en banc*).

DATED this 25th day of April, 2008.

Jacqueline Marshall
United States Magistrate Judge